UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 19-2352-JJO

UNITED STATES of AMERICA,

    Plaintiff,

v.

JESUS RAMON VEROES, and
LUIS ALBERTO CHACIN HADDAD,

    Defendants.
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003? _____ Yes __X__ No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007? _____ Yes __X__ No

    Respectfully submitted,

    ARIANA FARJARDO ORSHAN
    UNITED STATES ATTORNEY

BY: _____
    Michael B. Nadler
    Assistant United States Attorney
    Florida Bar No. 51264
    JLK Federal Justice Building
    99 Northeast 4th Street
    Miami, Florida 33132-2111
    Telephone: 305-961-9244
    Facsimile: 305-530-7976
    Email: michael.nadler@usdoj.gov

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No. 19-2352 JJO |
| LUIS ALBERTO CHACIN HADDAD & JESUS RAMON VEROES | ) ) ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __2016 - 2017__ in the county of __Miami-Dade__ in the __Southern__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1956(h) | Conspiracy to Commit Money Laundering |

This criminal complaint is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Warren Rodgers, ~~FBI~~ IRS Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 03/14/2019

_____
*Judge's signature*

City and state: Miami, Florida

U.S. Magistrate Judge John J. O'Sullivan
*Printed name and title*

## AFFIDAVIT

I, Warren E. Rogers, Jr., being duly sworn, hereby deposes and says that:

1.      I am a Special Agent of the Internal Revenue Service Criminal Investigations (IRS-CI) assigned to the Miami Field Office, High Intensity Drug Trafficking Area (HIDTA) Task Force. I have been a Special Agent with the IRS for approximately seventeen (17) years. As an IRS-CI Special Agent, my responsibilities include, but are not limited to, investigating criminal violations of Title 26, United States Code (USC) (Internal Revenue Code), Title 18, USC 1956, 1957, 1960, Title 31 USC, Bank Secrecy Act (BSA) violations, and other related offenses. For the last five (5) years, I have been assigned exclusively to the South Florida High Intensity Drug Trafficking Area Task Force (HIDTA), investigating Organized Crime Drug Enforcement Task Force (OCDETF) narcotics related money laundering cases.

2.      During my tenure assigned to South Florida HIDTA, I have been the primary case agent on numerous money laundering investigations of drug trafficking organizations (DTO) and money laundering organizations. These investigations have involved violations of Title 18, USC Sections 1956, 1957, 1960, 1962 (RICO) and other money laundering related Federal fraud violations including mail fraud, wire fraud and mortgage fraud. I have also conducted and participated in numerous asset forfeiture investigations involving Title 18 USC Sections 981 and 982, based on money laundering violations of Title 18 USC 1956, 1957 and 1960. Currently, I work with the IRS Financial Investigative Strike Team, investigating trade based money laundering cases such as black market currency exchange systems. As a Special Agent I have been the affiant and case agent/team leader on several successfully executed search and seizure warrants. I make this affidavit based on personal knowledge and upon information furnished to me by witness testimony and other law enforcement officers and sources.

1

3. The information set forth in this affidavit is provided solely for the purpose of establishing probable cause for the arrest of JESUS RAMON VEROES ("VEROES") and LUIS ALBERTO CHACIN HADDAD ("CHACIN") for conspiring to knowingly engage or attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000 that is derived from specified unlawful activity, to wit, felony violations of the Foreign Corrupt Practices Act (Title 15, United States Code, Sections 78dd-2 and 78dd-3), and offenses against a foreign nation involving bribery of a public official and the misappropriation, theft, and embezzlement of public funds by or for the benefit of a public official, contrary to Title 18, United States Code, Section 1957(a), all in violation of Title 18, United States Code, Section 1956(h). I have not included in this Affidavit each and every fact and circumstance known to me, but only the facts and circumstances that I believe are sufficient to establish probable cause.

I. BACKGROUND

4. CHACIN is a citizen of Venezuela and resident of the United States. CHACIN owns and manages businesses in Miami, Florida, including Company 1, and Company 2, both of which are registered under the laws of the State of Florida. Company 1 and Company 2 are "domestic concerns" as that term is defined in the FCPA. Company 1 and Company 2 purchase goods from around the world for export to Central and South America. Company 1 holds a bank account at Citibank in Miami, Florida and Company 2 holds a bank account at Bank of America, Miami, Florida.

5. VEROES is a Venezuelan citizen. VEROES's close relative is listed as the President of Company 3, a company based in Doral, Florida, and incorporated under the laws of the State of Florida. Company 3 holds a bank account at Bank of America. Company 3 is a "domestic concern" as that term is defined in the FCPA

6. Foreign Official #1 is a high-level official in Venezuela's Ministry of Electrical Energy and at Venezuela's state-owned electric company, Corporación Eléctrica Nacional, S.A. ("Corpoelec"). Corpoelec is controlled by the Venezuelan government and performs a function that Venezuela treats as its own, and thus is an "instrumentality" of the government of Venezuela as that term is defined in the FCPA. Foreign Official #1 is a "foreign official" as that term is defined in the FCPA.

7. Foreign Official #2 is a high-level official in procurement at Corpoelec and works under Foreign Official #1. Foreign Official #2 is a "foreign official" as that term is defined in the FCPA.

8. Confidential Witness 1 ("CW-1")[1] is a dual citizen of Venezuela and the United States and resides in Miami, Florida. CW-1 is a "domestic concern" as that term is defined in the FCPA. Beginning in approximately 2010, CW-1 engaged in various business ventures with CHACIN, and for a period of time, CW-1 and CHACIN occupied office suites next to each other in a building in Doral, Florida. As discussed below, CW-1 provided the following information to the U.S. Drug Enforcement Administration:

II. THE CONSPIRACY

9. In approximately February 2016, CHACIN informed CW-1 during a telephone conversation that CHACIN had business connections in Venezuela through VEROES, in particular, through VEROES's relationship with Foreign Official #1. In approximately May 2016, CHACIN called CW-1 while CW-1 was in China and asked CW-1 to start looking for transformers in connection with a future contract with Corpoelec. CHACIN told CW-1 that, as a result of VEROES's relationship with Foreign Official #1, they would be getting contracts to provide

---

[1] The Cooperating Witness has been providing information with the DEA for 16 months. He/she is motivated to provide information because the coconspirators did not provide the promised payment. The information provided by the CW has been corroborated through an audio recording, bank statements, emails, chats, invoices, and documentary evidence. Throughout his/her cooperation, the CW has appeared to be truthful and trustworthy.

3

generators and forklifts to Corpoelec. According to CHACIN, Foreign Official #1 directed VEROES to coordinate everything through Foreign Official #2. CW-1 was not able to obtain a source in China for supplying transformers under the contract with Corpoelec.

10. On or about June 15, 2016, CW-1 and CHACIN met in their offices in Doral, Florida. CHACIN had the following contracts in his possession: (a) contract dated May 25, 2016, for Company 1 to provide forklifts to Corpoelec for $6,429,000; (b) contract dated June 3, 2016, for Company 1 to provide transformers to Corpoelec for $9,789,250; and (c) contract dated June 3, 2016, for Company 1 to provide generators to Corpoelec for $893,713.89. These contracts were signed by Foreign Official #2. CHACIN also had purchase orders from Corpoelec for forklifts, transformers, and generators. CHACIN told CW-1 of a fourth contract between Corpolec and Co-Conspirator 1, who is President of a Florida corporation based in Port St. Lucie, to provide miscellaneous parts to Corpoelec.

11. During the June 15, 2016, meeting in Doral, Florida, CHACIN discussed with CW-1 the agreement between all parties involved in the Corpoelec contracts on how the profits from the contracts would be split. CHACIN stated that, first, Foreign Official #1 would be paid $2.5 million. CHACIN, VEROES, Co-Conspirator-1, and CW-1 each would receive 25% of the remaining profit. CHACIN also stated that VEROES was working on getting a private bond in Venezuela in order for Corpoelec to release half of the money owed to Company 1, as the contracts were structured for Corpoelec to pay 50% of the contract price up front.

12. VEROES ultimately did not obtain a bond covering the upfront payments from Corpoelec. CW-1 subsequently obtained bonds covering the forklift, transformer, and generator contracts from a Venezuelan bank as a result of a connection to the bank's owner.

13. In approximately late July 2016, VEROES, CHACIN, CHACIN's son, and CW-1

4

traveled to the United Arab Emirates to visit a company that sold forklifts. Company 1 ultimately purchased 28 forklifts from that company and 13 forklifts from another company for approximately $1.5 million (in total). Company 1 invoiced Corpoelec approximately $6,429,000 for 40 of those forklifts, which represents a profit of more than 300%.

14. Later in 2016, CHACIN and CW-1 had a falling out related to the transformer contract. CHACIN ceased communicating with CW-1 and began cutting CW-1 out of their shared business dealings. CW-1 subsequently obtained copies of paperwork related to the Corpoelec contracts for the forklifts, transformers, and generators from a secretary CW-1 shared with CHACIN. CW-1 has provided copies of that paperwork to the DEA.

15. In approximately early 2018, CW-1 also obtained a document bearing Corpoelec's logo that contains a chart with information about nine Corpoelec contracts. The chart lists five contracts between Company 1 and Corpoelec for a total of $23,198,663.90, including, *inter alia*, the forklift, transformer, and generator contracts discussed above; three contracts between Company 2 and Corpoelec, including a contract to supply lightbulbs, for a total of $13,003,208; and one contract between Co-Conspirator 1's company and Corpoelec for $685,000. The total value of these contracts is $36,886,871. According to the chart, most of the contracts – including the forklift, transformer, and generator contracts – had been designated as delivered and processed in full.

16. In approximately March 2017, VEROES met with CW-1 at CW-1's office in Doral, Florida. In a recorded conversation[2], VEROES said that that they had not been paid by Corpoelec because Corpoelec's Citibank account was closed. VEROES talked about two new deals with Corpoelec and said that they had not received payment for those contracts either. VEROES said

---

[2] This recording has been translated and reviewed by a Spanish speaker.

5

that CHACIN did not know that VEROES was coming to talk to CW-1, but VEROES wanted to assure CW-1 that CW-1 would get paid CW-1's share of the contracts. VEROES said they secured the contracts with Corpoelec because of VEROES's connection to Foreign Official #1 and claimed that CHACIN or Co-Conspirator 1 never would have obtained business from Corpoelec but for VEROES's relationship with Foreign Official #1. VEROES said that if the payment situation was not resolved soon, he would ask "the minister" – referencing Foreign Official #1 by first name – to call another official to help get the money. VEROES also said that his "buddy" was upset because "that money was his" but he did not have it yet and it was a large amount. Also during this conversation, VEROES again confirmed how the money would be split – in four parts among himself, CHACIN, Co-Conspirator 1, and CW-1. VEROES said that he was responsible for paying Foreign Official #2 and others at Corpoelec, referencing Foreign Official #2 by last name.

17. During their March 2017 meeting, VEROES also stated that they had shipped 500 transformers to Corpoelec, but the transformers could not be used in Venezuela because they were only compatible with the electrical systems in Cuba and Nicaragua. VEROES said that the shipped transformers are sitting at a Corpoelec storage patio. Despite the incompatibility, Corpoelec listed the transformer contract as delivered and processed in full according to the chart of contracts discussed above.

18. CW-1 never received his share of the money from the Corpoelec contracts agreed upon by CHACIN and VEROES.

19. Records reflect the following wire transfers from Corpoelec to accounts associated with CHACIN or VEROES:

   a. On or about July 12, 2016, Corpoelec wired approximately $3,211,286 to Company 1's Citibank account (ending 1390);

6

b.    On or about August 4, 2016, Corpoelec wired approximately $4,894,226 to Company 1's Citibank account (ending 1390);

c.    On or about August 8, 2016, Corpoelec wired approximately $446,210 to Company 1's Citibank account (ending 1390);

d.    On or about October 11, 2016, Corpoelec wired approximately $3,428,409 to Company 1's Citibank account (ending 1390);

e.    On or about November 16, 2016, Corpoelec wired approximately $981,352.48 to Company 1's Citibank account (ending 1390);

f.    On or about December, 15, 2016, Corpoelec wired approximately $445,906 to Company 1's Citibank account (ending 1390);

g.    On or about May 4, 2017, Corpoelec wired approximately $3,539,985.81 to Company 1's Citibank account (ending 1390);

h.    Between on or about August 22, 2016, and May 11, 2017, Corpoelec wired a total of approximately $4,476,152 to Company 2's Bank of America account (ending 8828). Notes to the transfer referenced an advance to contract number NCO-PR-2016-135. That contract, between Corpoelec and Company 2, was for the supply of lightbulbs and was valued at $5,799,000.

20.    Between April 4, 2017, and May 11, 2017, Company 2's Bank of America account (ending 8828) wired approximately $2,566,984 to Company 3's Bank of America account (ending 1683), referencing an advance to the same lightbulb contract discussed in the preceding paragraph.

21.    Based upon the foregoing, your Affiant submits there is probable cause to believe that JESUS RAMON VEROES and LUIS ALBERTO CHACIN HADDAD did conspire to knowingly engage or attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000 that is derived from specified unlawful activity, to wit, felony

violations of the Foreign Corrupt Practices Act (Title 15, United States Code, Sections 78dd-2 and 78dd-3), and offenses against a foreign nation involving bribery of a public official and the misappropriation, theft, and embezzlement of public funds by or for the benefit of a public official, contrary to Title 18, United States Code, Section 1957(a), all in violation of Title 18, United States Code, Section 1956(h).

FURTHER YOUR AFFIANT SAYETH NAUGHT

_____
Warren E. Rogers, Jr.

Sworn to and subscribed before me this
14th day of March 2019

_____
JOHN J. O'SULLIVAN
CHIEF UNITED STATES MAGISTRATE JUDGE

8